**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| VUNGH WAAN, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil No. 22-505-BAH |
| FGS, LLC, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This is a case about a dental appointment in Qatar, an international romance, national security, and a once-in-a-lifetime pandemic. It is also a case about Title VII. Plaintiff, Vungh Waan, brought suit against Defendant, Facchina Global Services, LLC ("FGS"), alleging he experienced discrimination and retaliation in his employment on the basis of his race and national origin after he was terminated from his job following his proposal to his girlfriend, Joy Magpayo-Valdez (Filipino), at a dental appointment in Qatar. ECF 1; ECF 23 (Amended Complaint), at 6–8. Pending before the Court is FGS' motion for summary judgment (the "Motion"). ECFs 52; 53.[1] Mr. Waan filed an opposition, ECF 61,[2] and FGS filed a reply, ECF 69. All filings include

---

[1] FGS filed a "Redacted" motion for summary judgment at ECF 52, and an "Unredacted" motion for summary judgment at ECF 53. The Court will cite to the redacted motion at ECF 52.

[2] Mr. Waan initially filed a memorandum of law and exhibits at ECF 59, along with a motion for leave to file excess pages, ECF 58. The memorandum of law was stricken when the Court denied Mr. Waan's request for more pages, ECF 60, and Waan refiled his brief at ECF 61. Therefore, when referring to Mr. Waan's exhibits, the Court will reference those exhibits originally submitted at ECF 59.

memoranda of law and exhibits.[3]  The Court has reviewed all relevant filings and finds that no

hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023).  Accordingly, for the reasons stated below,

FGS' Motion is **GRANTED**.

I.    **BACKGROUND**

Mr. Waan (Asian-American, native of Cambodia) alleges he was discriminated against

after an incident in which he and three coworkers, Dan Massey (Caucasian), Maroun Bechara, and

Clyde Randolph, temporarily left the military base in Qatar in which they worked during Covid

lockdown. ECF 52-4 (Waan Deposition), at 7, 14:1–7; ECF 52-4, at 17, 29:16–18 (detailing Covid

lockdown); ECF 52-4, at 20, 34:6–10 (detailing group that traveled off base).  While the group had

received approval to go to a dentist appointment, *id.* at 27, 45:1–46:2, the group had not disclosed

that Mr. Waan's and Mr. Massey's girlfriends would also be at the dentist's office. *See* ECF 59-

6, at 23, 55:7–14 (testifying Mr. Waan "didn't see a need to" inform his supervisors that he

intended to see his girlfriend at the appointment); ECF 52-3, at 13, 24:5–7.  After this information

came to light, Mr. Waan was terminated, ECF 52-4, at 15–16, 23:21–24:1, whereas Mr. Massey,

who also saw his girlfriend at the dentist, received only a verbal warning. ECF 59-7, at 36, 95:13–

18.

A.    **Factual Background**

In October 2019, Mr. Waan was hired as a full motion video analyst ("FMV analyst") by

FGS, an intelligence organization that contracts with governments to supply intelligence analysts

for national security purposes. *See* ECF 52-4, at 14–15, 22:18–23:7 (indicating FMV analysts

---

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

produce intelligence reports that are then disseminated to the intelligence community); ECF 52-2 (Haupt Declaration), at 2 ¶ 3 (describing FGS as a government contractor that provides FMV analysists for purposes of combatting terrorism, the proliferation of weapons of mass destruction, among other national security threats).

Mr. Waan was assigned to work at Al Udeid Air Base, in Qatar. ECF 52-3, at 6, 14:1–18 (indicating FGS has a long-standing contract to "provide full-motion video analysts who would analyze and produce imagery" and to "train military customers, both United States and foreign military members"); ECF 52-3 (Massey Deposition), at 4, 12:13–18. Mr. Waan reported to both FGS and the "Australian Military,"[4] the government agency FGS had contracted with for this particular project. ECF 52-5, at 2. Thus, "[o]perationally [Mr. Waan] reported to the Australian Military, but administratively [he] reported to FGS." *Id.*

Mr. Waan's first level supervisors were Imagery Manager Supervisors ("IMS"), who rotated on a daily basis, ECF 59-7, at 7, 20:14–22, and his second level supervisors were "shift leads." *See id.* (noting there had been "over 500 employees," making identification of the specific IMS that interacted with Mr. Waan difficult to determine); ECF 59-8 (Stephens Deposition), at 4, 8:16–9:1 (indicating a lack of recollection regarding the shift lead at the time). Mr. Waan's third level supervisor was Steve Stephens. *Id.* at 8:3. Mr. Stephens was the "site lead for the Qatar site." ECF 59-8 8:4–7 (indicating Mr. Stephens was Mr. Waan's third-level supervisor); *but see*

---

[4] The actual name of the Australian armed force to whom Mr. Waan reported is likely the Royal Australian Air Force, ECF 52-5, at 2 (noting that Major Peate was a member of the "Australian Air Force"), or the Australian Defence Force ("ADF"). ECF 59-13, at 2 (Waan declaration referring to Major Peate's employer as the ADF); *see also Organisation structure*, Australian Gov't Def., https://www.defence.gov.au/about/who-we-are/organisation-structure (last visited July 17, 2024) (affirming that the ADF "incorporates" the "Australia Army," the "Royal Australian Air Force," and the "Royal Australian Navy"). However, since the relevant filings and transcripts generally use the term Australian military, the Court will follow suit.

3

ECF 52-5, at 2 (describing Mr. Stephens as Mr. Waan's "immediate supervisor administratively").
Regardless of their degrees of separation in the organization, Mr. Stephens would "see [Mr. Waan]
daily" and provide administrative support to all FGS employees. ECF 59-8, at 5, 9:2–19.

Above Mr. Stephens in the organizational chart was Dr. Eric Haupt, the Executive Vice.
President for FGS.[5] ECF 52-2 (Haupt Declaration), at 2 ¶ 2. Dr. Haupt served as FGS' program
manager for contracting and was Mr. Stephens' supervisor. ECF 52-7 (Haupt Deposition), at 4,
9:4–22 (indicating Qatar was not Dr. Haupt's only project). Dr. Haupt had hiring and firing
authority. *Id.* 9:21–22.

Finally, on the operational side, Major Andrew ("Andy") Peate served as the Director of
Operations at the time of the events giving rise to this suit. *See* ECF 52-6 (Stephens Deposition),
at 9, 14:14–18; ECF 52-5, at 2 (indicating Director of Operations is a six-month rotation and that
in this role Major Peate had "full control of how the operation is ran"[sic] though the Director
"does not hire or fire employees"); ECF 59-7, at 40, 114:12–16 (indicating Major Peate had
authority to ban an employee from the work site and direct that the employee be sent back to the
United States, but termination decisions resided solely with FGS).

           1.     Covid-19 Lockdown at Al Udeid Air Base

This dentist appointment took place in July 2020, ECF 52-4, at 20, 34:3–5, towards the
beginning of the Covid-19 pandemic that began around March of 2020, *id.* at 16, 24:2–7 (indicating
the air base instituted Covid-19 restrictions and went on lockdown in March 2020). At Al Udeid
Air Base, the Department of Defense "operated on the U.S. Government COVID-19 guidance,"
which meant "[e]veryone was wearing masks at the time. Everyone was abiding by 6-foot

---

[5] Dr. Haupt is a Ph.D. and earned a "Doctorate of Business Administration with a specialization in
Leadership." ECF 52-2, at 2 ¶ 2.

separation, social distancing, use of hand sanitizer, no commingling, no physical touch." ECF 52-7, at 32, 80:13–19; ECF 52-4, at 17, 29:16–17 ("[W]e were just completely on lockdown."); ECF 52-3, at 30, 53:4–5 ("[W]e were not allowed to leave the military base for recreational purposes.").

All FGS employees lived on the base during the lockdown period. ECF 52-4, at 18–19, 30:14–31:1. Due to the lockdown, FGS was not able to get replacement FMV analysts on-site "for an extended period of time." ECF 52-3, at 31, 55:14–23. Thus, although employees were typically eligible to leave the base and take a two-week vacation ("R&R") after they had worked on base for six months, FGS was forced to suspend this policy. *Id.* at 28, 47:2–11.

During lockdown, FGS employees were required to obtain approval from the government customer, which in this case was the Australian military, to leave the base for medical appointments. ECF 52-4, at 27–28, 45:1–46:10. Off-base travel requests were required to be submitted to the government customer as an exception to policy ("ETP") request. *Id.* at 29, 54:4–7. The ETP, however, was intended to "allow off base travel for official business only." *Id.* 54:9–16; *see also* ECF 52-9 (including the ETP for Mr. Waan, Mr. Massey, Mr. Bechara, and their driver, Mr. Randolph, to travel to dental appointments on July 20, 2020); ECF 52-6, at 10–11, 15:5–14 (indicating exception to the policy was only for "necessities" so, for instance, if "somebody was needing to be seen by a dentist, [but] not a routine cleaning"). These requests had to first be approved by Mr. Stephens as the site lead, the senior enlisted leader as the government customer, the Director of Operations, Major Peate, and finally the camp commandant. ECF 52-4, at 33, 60:4–13; ECF 52-6, at 8–9, 13:22–14:21. Additionally, masks and social distancing were still required during off base travel. ECF 52-4, at 33–34, 60:14–61:3.

### 2.    The Dentist Appointment and Proposal

As a result of the Covid-19 pandemic and subsequent preventative social distancing measures, Mr. Waan and his girlfriend, Joy Magpayo-Valdez, were separated for approximately

four months. ECF 52-4, at 19, 31:10–16. After receiving approval to go off base for a dentist

appointment, Mr. Waan arranged for his girlfriend to also book an appointment at the same dentist

for the same day and time. ECF 52-4, at 21, 36:6–10 (acknowledging it was Mr. Waan's intention

for Ms. Magpayo-Valdez to be at the dentist and "have her dental treatment as well"). Mr. Waan

planned to use the opportunity to propose marriage to Ms. Magpayo-Valdez. *Id.* at 22, 37:6–10

("I felt that it was an opportunity, knowing that the COVID restriction is unknown for foreseen

time period, right, so because, because of that, I felt that this would be an opportunity for me to

propose to her. . . ." (all sic in original)). As a surprise for Mr. Massey, Ms. Magpayo-Valdez

arranged for Mr. Massey's girlfriend, May Bogate, to book a dental appointment as well. ECF 52-

4, at 23–24, 38:5–39:21.

After Mr. Waan proposed (and Ms. Magpayo-Valdez said "yes"), the couple posted

celebratory photographs to Facebook. ECF 52-21, at 2. The photographs depicted Mr. Waan

down on one knee proposing while masked, and displayed Mr. Waan and his fiancé smiling and

embracing. *See id.* In some pictures, Ms. Magpayo-Valdez and Mr. Waan are unmasked. *See id.*

FGS personnel were apparently not thrilled by the news of the upcoming nuptials because the

photos suggested Mr. Waan had violated Covid protocols, and thereby put members at the military

base at risk of contracting Covid-19. ECF 52-6, at 16, 24:14–21 (indicating Mr. Stephens felt that

"going and meeting a girlfriend, . . . put the floor at risk, that he'd put operations at risk," and Mr.

Stephens "stressed the importance that we had to be fully manned, as much as possible, because

of the sensitivity and the importance of what we did").

Mr. Waan's dental appointment and proposal took place on July 20, 2020. ECF 52-4, at

20, 34:3–5. The record does not reflect precisely when Mr. Waan's supervisors learned of the

proposal, nor does it reflect who informed them of the dual-purpose of the off-base travel (though

6

Mr. Massey and Mr. Waan suspected Clyde Randolph, their driver, informed their superiors, ECF 52-23, at 9). In any event, by July 23, 2020, Major Peate learned of the proposal and questioned Mr. Waan and Mr. Massey individually. *See* ECF 59-4, at 10, 27:5–24 (recalling the conversation occurred several days after the appointment, on July 23); ECF 52-23, at 7–8. Mr. Waan admitted to seeing his then fiancé at his appointment and Major Peate directed Mr. Waan to the medical clinic to be screened for Covid-19. ECF 52-4, at 28, 71:5–16; ECF 52-23, at 7. When Major Peate questioned Mr. Massey, Mr. Massey was apparently not as forthcoming as Mr. Waan. Though Mr. Massey admitted that Ms. Magpayo-Valdez and Ms. Bogate were also at the dental appointment, he denied that Ms. Bogate was his girlfriend and also denied kissing her. ECF 59-4, at 11; 28:2–8; *id.* at 27, 91:1–7. He did, however, admit to hugging Ms. Magpayo-Valdez and Ms. Bogate. ECF 59-4, at 11; 28:7–8 ("And [Major Peate] said, did you have close contact with [Ms. Magpayo-Valdez and Ms. Bogate], and I said, yes, I hugged them"). No FGS employees were present during Major Peate's questioning of Mr. Waan or Mr. Massey. ECF 52-4, at 39, 73:12–13.

That same day Major Peate recommended Mr. Waan be terminated because:

The member's actions have not only placed my entire [] workforce at risk of COVID-19 infection, it has risked the entire [] mission which has only just recovered from seven weeks of reduced manning. The off-base ETP clearly states that the business is for OFFICIAL BUSINESS only and regardless of any dental work carried out on [Plaintiff] on 20 Jul 20, the member has clearly abused these privileges for his own personal gain.

ECF 52-20 (emailing this recommendation to Mr. Stephens); *see id.* (including Mr. Stephens forwarding Major Peate's recommendation to Dr. Haupt). Dr. Haupt testified that he decided to terminate Mr. Waan on July 23, 2020, because:

[I]t was a dental event as a pretext for a proposal, and that he orchestrated, planned, executed the proposal event with others in attendance, and that he did so in violation of COVID-19 protocols at the time, he did so in violation of social distancing. And again, when you mash that up with the pattern that he already established in a short time frame, it

7

was time to part ways with Mr. Waan. . . . [W]e received a request from the government, we concurred, and we terminated.

ECF 52-7, at 21, 49:10–22; *see also id.* at 20–21, 48:20–49:4 (indicating Mr. Waan had a "distinct pattern at this point in July 2020, a number of incidents already" and that "this was just a culminating event"); ECF 52-4, at 15–16, 23:21–24:1 (indicating Mr. Waan received termination papers on July 23, 2020).

### 3.    The Allegedly "Distinct Pattern" of Misbehavior

This "distinct pattern" of misbehavior that Dr. Haupt referred to was in relation to: (1) Mr. Waan's alleged misuse of a clothing allowance in June and July of 2020; (2) Mr. Waan's failure to abide by directives to avoid a female coworker who had initiated a sexual harassment complaint against Mr. Waan; and (3) Mr. Waan's failure to report his foreign national girlfriend in violation of mandatory reporting requirements.

Regarding the clothing allowance, Dr. Haupt testified that he decided to create a program for FGS employees in Qatar that would reimburse employees for up to $500 in work clothing annually.  ECF 59-7, at 8, 26:1–19.  Ordinarily, employees wore tactical trousers, hiking gear trousers, or jeans, along with a collared shirt. *Id.* at 9–10, 27:10–28:3; *id.* at 9, 27:12–15 ("And my exact words were always the same, as long as there's no fades, tears, cuts, rips, you know, washouts, and don't bedazzle your jeans either.  You know, put all the jewels on them.  I said, bottom line is you have to present a professional appearance.").  The dress code policy was never written down.  ECF 52-4, at 47, 101:11–12.

In June 2020, Mr. Waan submitted a reimbursement request for a three-piece suit with a handkerchief.  ECF 52-4, at 50, 105:1–15.  Mr. Waan understood that a suit jacket was not a prohibited clothing item and was acceptable so long as it was professional in appearance. *Id.* at 47, 101:11–21.  Additionally, in July 2020, Mr. Waan submitted a receipt for a size 12 boot, a

8

double extra large long sleeve shirt, and 40-inch waist trousers, *id.* at 51, 106:6–21, although he

ordinarily wore a shoe size 9 ½, and his waist size is typically between 32 and 36 inches, *id.* at 42,

94:17–20; *id.* at 45–46, 99:21–100:2; *id.* at 43–44, 96:15–97:10 (indicating Mr. Waan is "between

5'8" and 5'9" [tall]" and weighs "approximately 175-ish"); *see also* ECF 52-15, at 2–9 (including

Mr. Waan's receipts for his purchases requesting reimbursements).

Mr. Stephens rejected both requests for reimbursement because the three-piece suit was

not a necessary work item in Qatar, ECF 52-6, at 24–25, 50:13–51:2, and the shoes and pants

requested in July appeared "too large for [Mr. Waan], and it seemed [to Mr. Stephens] that it was

something that he was not purchasing for himself," *id.* at 25–26, 51:20–52:2. Mr. Waan told Mr.

Stephens the double XL clothing and size 12 shoes "ran small and were for himself," and Mr.

Stephens did not believe him. *Id.* at 38, 82:7–20. Dr. Haupt testified that submitting multiple

fraudulent reimbursement requests was a terminable offense, and he previously terminated a

Caucasian employee for submitting two fraudulent claims. *See* ECF 52-7, at 12–14, 33:9–35:15.

Regarding the allegations of sexual harassment, around January 2020, ECF 52-4, at 71,

167:9–13, a female coworker accused Mr. Waan of sexually harassing her at a local dance hall's

"Latin Night." *Id.* at 68–69, 161:14–163:15. The coworker initiated a SHARP complaint,[6]

alleging that Mr. Waan had touched her inappropriately while dancing. *Id.* at 72–73, 168:17–

169:13; *see also* ECF 52-7, at 22, 50:5–20. Mr. Waan was instructed not to speak with this

coworker, a directive that FGS says Mr. Waan did not abide by. ECF 52-7, at 23, 51:3–15.

---

[6] A SHARP complaint is a sexual harassment complaint initiated with a sexual harassment and
response prevention organization within the United States Government. ECF 52-7, at 22, 50:5–
20. FGS does not control or influence that investigation, and that investigation was never
completed because Mr. Waan was terminated prior to the conclusion of the investigation and
before the allegations were "substantiated or not substantiated." ECF 52-7, at 26–27, 57:20–58:19.

Subsequently, the female coworker filed an HR complaint against Mr. Waan. *Id.* 51:14–15; ECF

52-10 (memorandum to Mr. Stephens on January 21, 2020); ECF 52-11 (memorandum to HR on

January 26, 2020, regarding harassment); *see also* ECF 52-12 (memorandum from Mr. Stephens

dated January 27, 2020, directing Mr. Waan not to communicate with the female coworker who

had complained and noting Mr. Waan was also directed to have no further contact with the

coworker on January 23, 2020). Because the "inappropriate behavior . . . . kept going," FGS

eventually moved the female coworker to a different shift to prevent interaction with Mr. Waan.

ECF 52-7, at 23–24, 51:20–52:6.

Finally, sometime after Mr. Waan's proposal to Ms. Magpayo-Valdez, FGS learned that

Mr. Waan had failed to properly report his close relationship with his foreign national fiancé. *See*

ECF 52-4, at 53, 113:2–6. Mr. Waan had a Top Secret/SCI security clearance, *see* ECF 59-2, at

2, and was required to report to the United States Government any close and continuing contact

with a foreign national.[7] ECF 52-4, at 53, 113:2–6. To report a close contact, individuals are

required to submit a "SF-86C" form. ECF 52-7, at 49, 153:2–8. Despite submitting a foreign

travel request to FGS seeking to travel abroad with Ms. Magpayo-Valdez in February 2020, Mr.

Waan did not identify Ms. Magpayo-Valdez as a foreign national on this form, *see* ECF 52-17, nor

did Mr. Waan verbally inform his supervisors of this close contact. *See* ECF 52-4, at 57, 125:4–

13 (indicating Mr. Waan does not recall telling Mr. Stephens that he was dating a foreign national);

ECF 52-6, at 28–29, 64:3–7; *id.* at 29, 65:3–10 (testifying that Mr. Waan mentioned having a

girlfriend to Mr. Stephens but never indicated that she was a foreign national). FGS presents

---

[7] The Department of Defense Consolidated Adjudication Service ("DCAS") handles adjudications
for security clearances. ECF 52-4, at 54, 119:14–18. Individuals must self-report close contact
with a foreign national. ECF 52-6, at 27, 60:9–10.

evidence that failing to identify a romantic relationship with a foreign national violates FGS policy and creates a potential national security risk.  ECF 52-7, at 15–17, 40:4–42:19.

### 4. A Meeting Between Mr. Waan and Mr. Massey and Major Peate on July 22, 2020

Mr. Waan, however, testified at his deposition that one day before his termination, Mr. Waan and Mr. Massey had a meeting with Major Peate in which Mr. Waan and Mr. Massey aired certain grievances, including a complaint of "disparate treatment."  ECF 52-4, at 12–14, 20:15–22:7; *id.* at 9, 16:7–10.  Mr. Waan asserts that he was terminated in retaliation for these complaints. ECF 23, at 7–8 ¶¶ 62–71.

The topics discussed in this meeting included complaints about FGS' R&R policy, and Mr. Stephens' managerial decision making.  ECF 52-3, at 26–28, 45:13–47:11 (including Mr. Massey's recollection of the meeting that Mr. Waan's primary grievance was that he had not yet been permitted to take his vacation since he was hired in the fall of 2020); *id.* at 36, 87:13–24.  Mr. Waan testified that he told Major Peate he was being treated "disparately"; however, Mr. Waan does not recall stating that he was being treated differently than any other particular employee, ECF 52-4, at 60, 141:1–5, or Caucasian employees, nor does he recall using any terms like "race," "national origin," "white," "Caucasian," or discrimination based on any protected category.  ECF 52-4, at 58–59, 139:4–140:6; *id.* at 59, 140:15–21; *id.* at 60–61, 141:16–142:1.

Mr. Waan testified that when he told Major Peate he was being treated "disparately," he meant he was being treated differently than "white people in general, but not specifically Mr. Massey."  ECF 52-4, at 60, 141:6–10; *id.* at 61, 142:13–17.  One day after the meeting with Major Peate, and three days after the dental appointment, Mr. Waan was terminated.  *Id.* at 15–16, 23:21–24:1 (indicating Mr. Waan received termination papers on July 23, 2020).  Mr. Massey received only a verbal

warning. ECF 59-7, at 36, 95:13.  After Mr. Waan was terminated, he lost his Top Secret/SCI security clearance, and contends his career has been "decimated" as a result.  ECF 61, at 6.

### 5.   Plaintiff's Proposed Comparator: Dan Massey

Plaintiff's co-worker and friend, Dan Massey, was originally hired in May 2018 as an FMV Analyst. ECF 52-3, at 4, 12:8–12; *id.* at 7, 15:14–15 (testifying Mr. Massey and Mr. Waan were· "casual acquaintances and friends in the workplace").  Mr. Massey is a white, Caucasian male. ECF 59-6, at 7; 14:6–7. When asked who his supervisor was, Mr. Massey indicated that as a FMV Analyst, he had "two supervisors, but the majority of the time [Mr. Massey's] supervisor was Steve. Stephens." *Id.* at 7, 15:1–2.

In April 2020, Mr. Massey began working as an "information technology support technician." ECF 52-3, at 5, 13:9–12.  As an IT technician, Mr. Massey was responsible for "[s]upporting the analysts and military customers" by "creating accounts, imaging, new computer systems, connecting computer systems to the network infrastructure and troubleshooting desktop issues for the analysts and military customers." *Id.* 13:15–20.  After switching to an IT role, Mr. Massey's supervisor was Mitch Soper.  *Id.* at 7, 15:3–5.

Days after Mr. Waan's termination on July 23, 2020, Mr. Stephens discovered that Mr. Massey had lied when he said he had his mask on the entire time. *See* ECF 59-15 (including a July 25, 2020 email from Mr. Stephens to Dr. Haupt asking whether he needs to send the photo of Mr. Massey unmasked to [Major Peate] with Dr. Haupt replying, "We have to[]. It put the Team at risk"). The photographs were shown to Major Peate, and "Major Peate decided to keep Mr. Massey. This was Massey's first behavioral issue or offense . . . ." ECF 59-7, at 35, 93:18–21.

### B.   Procedural Background

Mr. Waan filed a Charge of Discrimination with the Equal Employment Opportunity Commission on September 14, 2020. ECF 1-1. On February 23, 2022, Mr. Waan received a

Notice of Right to Sue.  ECF 1-2.  Mr. Waan filed his initial complaint with the Court on March 2, 2022.  ECF 1.  Mr. Waan filed the operative complaint on June 10, 2022.  ECF 23.

Mr. Waan initially brought three counts, in which he alleged discrimination and retaliation in violation of Title VII (Counts I and II), and discrimination in violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 et seq (Count III).  *See* ECF 23, at 6–11.  FGS filed a motion to dismiss all counts, ECF 24, and after a hearing on the motion, the Court granted FGS' motion as to Count III and denied FGS' motion as to Counts I and II.  *See* ECF 36.  The parties completed discovery on the remaining counts and FGS filed the present dispositive motion.  *See* ECF 51.  The dispute is ripe for disposition.

## II.    **LEGAL STANDARD**

### A.    **Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

13

properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court cannot weigh evidence, *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (citing *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659–60 (4th Cir. 2018)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

## B.    Summary Judgment in the Title VII Context

Title VII, in relevant part, prohibits employers from "discharg[ing] any individual, or otherwise [] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

A plaintiff may meet her summary judgment burden of establishing a genuine dispute of material fact either by offering direct or circumstantial evidence, or by proceeding under the scheme set forth in *McDonnell Douglas Corp. v. Green.* 411 U.S. 792, 802 (1973); *Evans v. Techs. Application & Servs. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). *McDonnell Douglas* sets out a three-.

step scheme in which the plaintiff bears the initial burden of establishing "a prima facie case of discrimination by a preponderance of the evidence." *Evans*, 80 F.3d at 959. If the plaintiff meets this burden, the defendant-employer can rebut the presumption of discrimination by presenting evidence of a legitimate, non-discriminatory reason for its employment actions. *Id.* If the defendant-employer provides this reason, the presumption of discrimination "drops out of the picture" and the burden shifts back to the plaintiff to demonstrate that the defendant's rationale is pretextual. *Id.* At bottom, the "plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

In considering the ultimate question of pretext, the Fourth Circuit has repeatedly cautioned district courts to "take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue." *Evans*, 80 F.3d at 958–59 (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir 1987)). Nevertheless, "summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Id.*

## III.   ANALYSIS

Mr. Waan alleges that "FGS targeted [him] based on his race and national origin." ECF 61, at 5. FGS argues that "[t]he [r]ecord is devoid of any evidence that Mr. Waan's race or national origin played any role whatsoever in any employment decision throughout his tenure." ECF 52-1, at 7. For the reasons included herein, the Court agrees with FGS that Mr. Waan has not demonstrated that his termination was based on his race or national origin, or complaints about the same.

15

## A.   Race-Based and National-Origin-Based Discrimination

In Count I, Mr. Waan alleges discrimination on the basis of his race and national origin in violation of Title VII. ECF 23, at 6–7 ¶¶ 48–61. Mr. Waan asserts a theory of disparate treatment.[8] *See id.* at 6–7 ¶¶ 58–59 ("Both Mr. Waan and Mr. Massey scheduled dental appointments at the same time as their girlfriends, but only Mr. Waan was criticized for meeting Ms. Magpayo-Valdez at the dentist" and that "FGS terminated Mr. Waan because of his race and/or national origin").

"To establish a prima facie case of disparate treatment, [a plaintiff] must show: (1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019) (citing *Coleman v. Md. Ct. of Apps.*, 626 F.3d 187, 190 (4th Cir. 2010)). FGS argues that Mr. Waan failed to establish the second and fourth elements of his prima facie case, namely, that he was performing to FGS' satisfaction at the time of his termination and that he was treated differently than similarly situated employees outside his protected class. ECF 52-1, at 26 (acknowledging "[i]t is undisputed that Mr. Waan is a member of a protected class (Asian/Cambodian) and experienced an adverse employment action (termination)"). Because the Court finds Plaintiff has failed to establish the fourth element of a prima facie case, the Court begins and ends its analysis of Count I there.

The parties dispute whether Mr. Waan has successfully demonstrated that he and Mr. Massey are comparators. *See* ECF 69, at 19; ECF 61, at 24–25, 34–36. This Circuit's precedent

---

[8] When a plaintiff is terminated due to misconduct or due to poor work performance, the plaintiff might allege either a discriminatory discharge claim, a discriminatory enforcement claim, or both. *Tims v. Carolinas Healthcare Sys.*, 983 F. Supp. 2d 675, 679–80 (W.D.N.C. 2013) (discussing both); *Moore v. Penfed Title, LLC*, Civ. No. 20-0867, 2021 WL 2004785, at *10 (E.D. Va. May 18, 2021) ("Discriminatory termination and discriminatory enforcement of employee disciplinary measures are separate causes of action.").

is clear that "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008); *see also Tex. Dep't of Cmty. Affs.*, 450 U.S. at 258 ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally."). If there are simply not "enough common features between the individuals to allow [for] a meaningful comparison," *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir.2007), *aff'd on other grounds*, 553 U.S. 442 (2008), a district court may properly find there is "no disparity of treatment from which one could conclude that [the plaintiff's] discipline was a product of racial [or national origin] discrimination." *Hurst v. District of Columbia*, 681 F. App'x 186, 193 (4th Cir. 2017) (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)).

Plaintiff argues he has established that he and Mr. Massey engaged in comparable misconduct, as they both kissed their girlfriends at a dentist appointment in Qatar in violation of Covid-19 protocols, yet Mr. Waan (Asian American, native of Cambodia), received harsher punishment than Mr. Massey (Caucasian). ECF. 61, at 34–36; *see also* ECF 59-6 (Waan Deposition), at 7, 14:1–5 ("Mr. Massey and I were in the same predicament, but yet . . . I was ultimately the only one that was terminated, and Mr. Massey was white . . . ."); ECF 59-4 (Massey Deposition), at 9, 24:1–20 (indicating Ms. Bogate, someone Mr. Massey was "casually dating" at the time, was also present at the dental appointment); *id.* at 11, 28:9–20 (indicating Mr. Massey took his mask off at the dental appointment and lied to Major Peate about his romantic relationship with Ms. Bogate). FGS counters that Mr. Massey is not a proper comparator because: (1) Mr. Waan and Mr. Massey had different jobs and supervisors; (2) Mr. Massey was less culpable as he did not know his girlfriend would be present at the dental appointment; and (3) Mr. Massey did not have a misconduct record similar to Mr. Waan, ECF 69, at 19–20. Additionally, the record

reflects a fourth difference: (4) Mr. Massey lied about his level of misconduct to his supervisors,
ECF 59-4, at 11, 28:2–20, creating the appearance that he and Mr. Waan engaged in qualitatively
different rule violations. *See* ECF 59-7, at 35–36, 93:1–14 (indicating it was not until a few days
later, July 25, 2020, that Mr. Stephens showed Dr. Haupt that Mr. Massey had his "mask below
his nose" and that there "may have been a photo with the mask under his chin" and he ordered that
photo be forwarded to Major Peate to determine Mr. Massey's disciplinary action); ECF 52-22
(email communication on July 25, 2020, regarding informing Major Peate of a photograph of Mr.
Massey without a mask from the dentist appointment); ECF 59-7, at 36, 95:5–6 (indicating that
had Dr. Haupt seen the photographs of messages between Mr. Massey and Mr. Waan that showed
Mr. Massey had been kissing his girlfriend, he would have "terminated [Mr. Massey] on the spot").
Plaintiff presents no caselaw supporting that Mr. Massey is a comparator in light of these
significant differences, *see* ECF 61, at 34–36.

          1.     <u>Mr. Waan and Mr. Massey were subject to the same requirement to follow</u>
                    <u>Covid-19 social distancing and masking protocols.</u>

First, as FGS notes, a plaintiff must generally produce evidence that the plaintiff and
comparator "dealt with the same supervisor, [were] subject to the same standards and . . . engaged
in the same conduct without such differentiating or mitigating circumstances that would
distinguish their conduct or the employer's treatment of them for it." ECF 52-1, at 29–30 (quoting
*Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (alteration in original));
*see also Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).

In this case, the misconduct that triggered Mr. Waan's termination was a violation of
Covid-19 masking protocols. ECF 59-7, at 36, 95:9–11 ("The COVID guidance was clear. They
put the entire organization at risk."). The Covid-19 protocols applied to everyone at the Al Udied
Air Base. ECF 52-7, at 32–33, 80:13–81:9 (indicating these were "military policies and procedures

. . . not FGS"); *id.* at 33 81:10–20 (testifying FGS operated in a supporting role by providing covid masks "for the entire site"). Thus, as is relevant here, Mr. Waan and Mr. Massey were "subject to the same standards," *Haynes*, 922 F.3d at 223–24, regardless of differences in their supervisors. *See* ECF 52-3, at 7, 15:3–5 (noting Mitch Soper was Mr. Massey's supervisor); ECF 61, at 35 (disputing Mr. Waan's supervisor, without comparison to Mr. Massey).

FGS argues that Mr. Waan has not met his initial burden when Mr. Waan's job responsibilities are different than those of Mr. Massey.[9] ECF 52-1, at 30. Plaintiff counters that "Stephens was not Waan's direct supervisor" and Mr. Waan's first-level supervisor was actually "IMS," and Stephens was "three levels above" Waan. ECF 61, at 35 (quoting ECF 52-6, at 5, 8:3–11). This dispute about the organizational chain, however, is immaterial when the "conduct" at issue—violating Covid-19 protocols—was unrelated to the substantive work performance of employees and anyone, regardless of status, position, or supervisor could jeopardize the health of others at the military base. *Accord Haynes*, 922 F.3d at 223–24.

Recognizing that both Mr. Massey and Mr. Waan were required to follow Covid-19 protocols, the Court nevertheless finds that Mr. Waan has failed to demonstrate that Mr. Massey "engaged in the same conduct without differentiating or mitigating circumstances" that would "distinguish" FGS' treatment of Mr. Massey. *Haynes*, 922 F.3d at 223–24. Mr. Waan's and Mr. Massey's misconduct is distinguishable in three ways: (1) the apparent type of rule violation; (2)

---

[9] Mr. Massey served as an IT support technician, where he performed functions such as "imaging new computer systems, connecting computer systems to the network infrastructure and troubleshooting desktop issues for the analysts and military customers." ECF 52-1, at 13 ¶ 16. Mr. Massey's supervisor was Mitch Soper. *Id.* By contrast, Mr. Waan was an FMV Analyst (who analyzed real-time imagery intelligence from unmanned aerial vehicles). Mr. Waan's first level supervisors were rotating IMS and his second level supervisors were rotating shift leads. ECF 52-6, at 5, 8:3–21. Mr. Waan's third level supervisor was Mr. Stephens. *Id.*

the apparent level of culpability; and (3) the apparent frequency of prior misconduct. ECF 69, at 19–20.

2.     On July 23, 2020, it appeared to Dr. Haupt that only Mr. Waan engaged in a rule violation.

Courts often analyze whether a plaintiff and comparator engaged in the same rule violation or same type of rule violation, as similar rule violations are likely to cause comparable harm. *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) ("The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed."); *Yoon v. Sebelius*, 481 F. App'x 848, 850 (4th Cir. 2012) (noting differences in the harm caused by various nurses' misconduct when doctors complained of only the plaintiff's conduct and only plaintiff's conduct involved insubordination). A comparison of the relative severity of employees' misconduct can be made "in light of the harm caused or threatened to the victim or society, and the culpability of the offender." *Id.* (quoting *Moore*, 754 F.2d at 1107).

At the time Dr. Haupt made the decision to terminate Mr. Waan, July 23, 2020, he did not know that Ms. Bogate was Mr. Massey's girlfriend, he did not know that Mr. Massey had also taken his mask off, and he did not know that Mr. Massey had kissed Ms. Bogate. *See* ECF 59-7, at 35, 93:1–95:6 (indicating it was not until later that Dr. Haupt knew Mr. Massey had his "mask below his nose" and that there "may have been a photo with the mask under his chin" and he ordered that photo be forwarded to Major Peate to determine whether Mr. Massey should also be banned from the site); ECF 69-1, at 5 24: 14–21; *id.* at 36, 95:5–6 (indicating that had Dr. Haupt seen the photographs of messages between Mr. Massey and Mr. Waan that showed Mr. Massey had been kissing his girlfriend, he would have "terminated [Mr. Massey] on the spot").

The only information Mr. Massey had disclosed to Major Peate and Mr. Stephens was that he had hugged Ms. Magpayo-Valdez while remaining masked.[10]  ECF 59-14, at 5–6 (including messages from Mr. Massey to Mr. Waan recounting Mr. Massey's meeting with Major Peate, stating he denied that he was dating one of the women present, and admitting only to hugging Ms. Magpayo-Valdez, and that he had his mask on and otherwise kept his distance).  Indeed, the record does not reflect that Major Peate made any recommendation about Mr. Massey's purported conduct of hugging while masked, *see* ECF 52-20 (emailing Dr. Haupt only about Mr. Waan); *see also* ECF 69-1, at 4, 23:10–12, and the record reflects that Dr. Haupt was not informed of Mr. Massey's purported masked hug on July 23, 2020. *See* ECF 69, at 6 (citing ECF 69-1, at 4–5, 23:21–24:4).

On July 23, 2020, when Dr. Haupt terminated Mr. Waan, no photographic evidence yet showed that Mr. Massey had blatantly violated masking protocols at the appointment. *See* ECF 52-21, at 2 (displaying one selfie of Mr. Massey, Mr. Waan, Ms. Magpayo-Valdez, and Ms. Bogate, all with their masks on properly, except Mr. Massey, whose mask fell slightly below his nose).  By contrast, on July 23, 2020, again, the day when Dr. Haupt made the decision to terminate

---

[10] Plaintiff does not expressly raise a "cat's paw" theory of liability. *See* ECF 61.  Under a cat's paw theory of liability an employer may be held liable for employment discrimination "based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155 (4th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011)); *see also id.* (noting "[t]he extent to which co-workers, as opposed to supervisors, can be the basis for invoking the cat's paw theory of liability has not been resolved by the Supreme Court").  Extending cat's paw liability to FGS based upon alleged animus of Major Peate—an individual who is not employed by FGS— may constitute the type of improper "expansion of the theory to a context in which its application has not been recognized" that the Fourth Circuit previously disclaimed in *Smyth-Riding*. *See id.* Given that Plaintiff has not raised the argument, the Court need not address this novel application of Title VII liability to non-employees that influence the decision-maker's employment decisions.

21

Mr. Waan, he knew that Mr. Waan had taken his mask off, stood within six feet of, and kissed his girlfriend as it was visible in the photographs posted publicly to Facebook. *Id.* Dr. Haupt also knew that Mr. Waan could not, and apparently did not, deny any of these facts. *Id.*; *see also* ECF 52-19, at 3 ¶ 13 (admitting that Ms. Magpayo-Valdez and Mr. Waan "engaged in a brief greeting hug and kiss").

In terms of the potential harm caused, at the time of the termination decision, Dr. Haupt believed that only Mr. Waan's misconduct created a risk of harm to the base, given the photographs clearly demonstrating that Mr. Waan was maskless and stood next to Ms. Bogate and Ms. Magpayo-Valdez. ECF 52-21, at 2. By July 25, 2025, Mr. Stephens informed Dr. Haupt that Mr. Massey had worn his mask incorrectly and been in close proximity to Ms. Bogate and Ms. Magpayo-Valdez, ECF 59-7, at 35, 93:1–6; *id.* at 34, 86:1–5, and he recommended that the photograph be forwarded to Major Peate given that it "put the team at Risk." *Id.* 93:8–14. Even still, Mr. Massey never confessed that Ms. Bogate was his girlfriend, ECF 52-3, at 37, 91:1–7, and therefore, while Dr. Haupt was aware of Mr. Waan kissing someone at the dentist, the worst misconduct he became aware of regarding Mr. Massey while Mr. Massey was employed by FGS was that Mr. Massey incorrectly wore his mask and failed to social distance while at the dentist. ECF 59-7, at 35, 93:1–95:6. The level of contact also serves as a factor differentiating FGS' response to Mr. Waan's and Mr. Massey' rule violations, because close contact such as kissing may reasonably be assumed to pose a greater risk of contraction and transmission of a virus, when compared to merely being maskless or wearing one's mask improperly.

For instance, in *Yoon*, the Fourth Circuit noted that although the plaintiff pointed to four Caucasian nurses who also engaged in misconduct, none of the proposed comparators engaged in comparably serious misconduct because none "engaged in a heated argument with a doctor in front

of a patient or were motivated by an insubordinate effort to supplant a doctor's judgment with her own." 481 F. App'x at 850. Just like in *Yoon*, Dr. Haupt understood that Mr. Waan engaged in a more serious rule violation that demonstrated insubordination for FGS' rules and policies. The fact that it was not until two weeks prior to Dr. Haupt's deposition in this case, sometime in August 2023, *see* ECF 59-7, at 2, that he learned the full extent of Mr. Massey's misconduct, *id.* at 36, 95:5–6, demonstrates that at the time Dr. Haupt made the decision to give Mr. Massey a verbal warning, Dr. Haupt believed Mr. Waan and Mr. Massey had engaged in misconduct that posed different levels of risk to the health and safety of members at the Al Udied Air Base and which demonstrated differing levels of insubordination.[11]

Plaintiff does not engage with this dispute and merely argues that it is "incredulous to assert that Massey did not engage in similar conduct to Waan." ECF 61, at 35. Plaintiff fails to account for the fact that he must generate an inference of discrimination as to the relevant decisionmaker based on what was known to the decisionmaker at the time the disciplinary decisions were made.

                3.     <u>It appeared to Dr. Haupt that Mr. Waan misused the ETP request to propose to his girlfriend.</u>

Additionally, Dr. Haupt had more reason to differentiate between the misconduct of Mr. Massey and Mr. Waan as Dr. Haupt believed that Mr. Waan had planned the dentist appointment

---

[11] This is not to say that additional evidence of the full scope of Mr. Massey's misconduct did not exist at the time of Mr. Waan's termination, Dr. Haupt just didn't have it in his possession. Immediately prior to his termination, Mr. Waan and Mr. Massey exchanged text messages in which Mr. Massey says he will "play dumb" if questioned about Mr. Waan and his girlfriend, ECF 52-23, at 2, Mr. Massey admits to lying about whether his girlfriend was present at the dentist, *id.* at 5, and Mr. Waan noted that Mr. Massey and his girlfriend "kissed more than [Mr. Waan and Ms. Magpayo-Valdez] did, LOL," *id.* at 5. However, it is undisputed that Dr. Haupt did not learn of the full extent of Mr. Massey's misconduct until well after this litigation began and after Mr. Massey had left FGS on his own. ECF 52-7, at 39; 94:5–16. Dr. Haupt testified that had he known the full extent of Mr. Massey's flouting of COVID-19 protocols on July 25, 2023, he would have "terminated [Mr.] Massey immediately." *Id.*; 94:12–13.

as a pretext for proposing, whereas, it is undisputed that Mr. Massey did not know that Ms. Bogate would also attend the dentist appointment. ECF 52-4, at 23–24, 38:5–39:21 (indicating Mr. Waan agreed that Mr. Massey "was surprised" to see Ms. Bogate at the dentist on July 20, 2020). While Mr. Waan insists that Ms. Magpayo-Valdez also received dental care, this is immaterial as the crucial difference in culpability lies in what Mr. Waan and Mr. Massey knew or expected when they requested an ETP to go to a dental appointment. Mr. Waan's orchestration of a proposal at the dentist showed a level of forethought, planning, and deception that an employer could reasonably regard as a misuse of trust, abuse of privileges, and a disregard for mandatory directives.

4.  <u>Dr. Haupt relied on Mr. Waan's history of misconduct when deciding to terminate Mr. Waan, and relied on Mr. Massey's lack of misconduct in deciding to give him a verbal warning.</u>

Further, an inference of discrimination does not arise based on the disparate treatment of Mr. Massey after it was discovered that he, too, had been maskless, because Mr. Massey and Mr. Waan had different disciplinary records. Courts routinely find a plaintiff and proposed comparator are not similarly situated where the plaintiff has engaged in misconduct more frequently than the proposed comparator. *See Yoon*, 481 F. App'x at 850 (finding insufficient comparability when comparators did not have a history of workplace reprimands like the plaintiff); *Gamble v. FCA US LLC*, 993 F.3d 534, 539 (7th Cir. 2021) (finding plaintiff and comparator not similarly situated when plaintiff had two instances of misconduct on his record and comparator had only one).

In this case, Mr. Waan had two prior instances of misconduct on his record: an alleged misuse of a clothing reimbursement program and an alleged violation of FGS' directive to stay away from a female coworker that filed a sexual harassment complaint against Mr. Waan. *See* ECF 52-7, at 12–14, 33:9–35:15 (testifying that submitting multiple fraudulent reimbursement requests was a terminable offense, and he previously terminated a Caucasian employee for

24

submitting two fraudulent claims); *see also id.* at 23, 51:3–15 (indicating Mr. Waan disobeyed a directive from a supervisor to "stay completely clear" of the female coworker that had accused Mr. Waan of sexual harassment). By contrast, Mr. Massey had no prior instances of misconduct. *See* ECF 59-7, at 37, 96:4–6 ("[Mr. Waan] had a distinct patter of misbehavior or misjudgments, whereas Dan Massey was an excellent employee at the time."); *id.* at 35, 93:18–22 (explaining the maskless photograph of Mr. Massey "was shown to . . . Major Peate. . . . Major Peate decided to keep Mr. Massey. This was Mr. Massey's first behavioral issue, or offense. . . .").

Mr. Waan argues that any misconduct he engaged in prior to the dentist appointment was unintentional. *See* ECF 61, at 32–33 (indicating that Mr. Waan ordered larger clothes because they ran small, and he ordered a suit because he did not believe it would be improper); *id.* at 31–32 (indicating sexual harassment claims were unsubstantiated and that he disputes whether he violated any directive to stay away from the complainant); *id.* at 33 (arguing no one told him directly to complete a SF-86C form to report his relationship with Ms. Magpayo-Valdez). However, Mr. Waan fails to demonstrate how these disputes are material. *See Libertarian Party of Va.*, 718 F.3d at 313 ("A fact is material if it 'might affect the outcome of the suit under the governing law.'" (citation omitted)). Regardless of the fairness of the prior determinations that Mr. Waan had engaged in misconduct, no one disputes that Dr. Haupt understood that Mr. Waan did, in fact, have a record of misconduct. *Id.* at 12–15 (disputing only fairness concerns and that any error was unintentional). Mr. Waan does not point to evidence in the record showing that he contested these prior instances of misconduct as inaccurate, nor does he provide any other evidence that would cause Dr. Haupt to not rely on these prior instances of misconduct when reaching the decision to terminate Mr. Waan. *See generally* ECF 61.

The undisputed fact remains that Dr. Haupt believed, at the time he made the termination decision, that Mr. Waan had a history of disregarding policies and directives from FGS and misusing official programs for personal gain, whereas the allegation of disregarding COVID-19 protocols at the dentist was Mr. Massey's first incident of misbehavior. *Supra.* As similarities or dissimilarities in the frequency of misconduct as between a plaintiff and comparator are particularly relevant to an assessment of comparable culpability, *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997), this factor strongly reinforces this Court's conclusion that Plaintiff has failed to generate an inference of discrimination by merely comparing Mr. Waan's termination to Mr. Massey's verbal warning.

Given these substantial differences, differences that were apparent to Dr. Haupt at the time of Mr. Waan's termination decision and Mr. Massey's verbal warning determination, there are simply not "enough common features between the individuals to allow [for] a meaningful comparison." *Humphries*, 474 F.3d at 405. Further, Plaintiff has failed to identify relevant caselaw that would support the Court finding that Mr. Massey serves as a comparator in light of the significant differences apparent to Dr. Haupt at the time of the disciplinary decisions. *See* ECF 61, at 34–36. From this record, Plaintiff has failed to demonstrate a prima facie inference of discrimination, *Hurst*, 681 F. App'x at 193, and Count I is dismissed.

### B.   Retaliation

In Count II, Plaintiff alleges he was terminated in retaliation for complaints of discrimination he made to Major Peate on July 22, 2020. *See* ECF 23, at 7 ¶¶ 65–66. Title VII prohibits "retaliation against an employee for opposing adverse actions that [he] reasonably suspects to be unlawful under Title VII." *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (citing 42 U.S.C. § 2000e-3). Like proving discrimination and disparate treatment under

26

Title VII, a plaintiff may establish that his employer's conduct was made with retaliatory intent through direct evidence or the *McDonnell Douglas* burden-shifting framework. *Id.* Plaintiff proceeds under the *McDonnell Douglas* framework. *See* ECF 61, at 37–39.

"Under the burden-shifting framework, the plaintiff must first establish a prima facie case of retaliation by showing: (1) [he] engaged in a protected activity; (2) the employer acted adversely against [him]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers*, 895 F.3d at 327 (internal quotation marks and citation omitted). FGS argues that Mr. Waan failed to establish the first and third elements necessary to meet his prima facie burden. ECF 52-1, at 33–35. The Court agrees on the first element, and therefore, need not reach the third.

### 1.     Protected Activity

A "protected activity includes an employee's opposition to what he or she believes is an unlawful employment practice." *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248 (D. Md. 2016). An employee may "oppose" an unlawful employment practice merely by "voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). The Fourth Circuit has explained that "while individual acts may be scrutinized to determine 'their nature, purpose, and nexus to the alleged objective,' the plaintiff's conduct must be examined 'as a whole.'" *Bowman*, 173 F. Supp. 3d at 248 (quoting *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015)).

When considering whether a particular action constitutes a protected activity the Court must first examine whether the employee "communicate[d] to her employer a belief that the employer has engaged in . . . a form of employment discrimination." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009). "If this first question is answered in the

27

affirmative, then a court considers whether this communicated belief concerns a practice that is 'actually unlawful under Title VII' or that the employee 'reasonably believes to be unlawful.'" *Bowman*, 173 F. Supp. 3d at 248 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015)).

Simply stated, if Mr. Waan was merely complaining of general "unfair treatment" to Major Peate, his complaints will not constitute a protected activity. *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 588 (D. Md. 2012); *Harris v. Md. House of Corr.*, 209 F. Supp. 2d 565, 570 (D. Md. 2002). However, "where the employer understood or should have understood that the plaintiff opposed an unlawful practice, that opposition is protected activity." *Bowman*, 173 F. Supp. 3d at 248 (citing *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012)).

Putting aside the fact that Major Peate (a member of the Australian military) is not Mr. Waan's employer (FGS), ECF 52-5, at 2, FGS argues that Mr. Waan only complained generally of unfair treatment and he did not use terms like "race," "national origin," "white," or "Caucasian," when complaining to Major Peate to support his retaliation claim. ECF 52-1, at 33–34. Mr. Waan contends that there is "no magic word requirement" and that his complaints about specific instances in which he was treated less favorably than other colleagues should have alerted Major Peate that Mr. Waan was complaining about an unlawful employment practice protected under Title VII. ECF 61, at 38 (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011)); *see also Okoli*, 648 F.3d at 223–24 (holding that a plaintiff's use of the word "harassment complaint" as the title of an email along with reference to dehumanizing harassment was enough to convey to the employer that her complaint "likely encompassed sexual harassment"); *cf. Chang Lim v. Azar*, 310 F. Supp. 3d 588, 604 (D. Md. 2018) (holding a plaintiff that did not mention race, color, or national origin discrimination did not engage in a protected activity).

2.      Mr. Waan's "Talking Points" in the July 22, 2020, Meeting with Major Peate

As evidence that Mr. Waan raised a complaint of discriminatory treatment in the meeting with Major Peate, Plaintiff points to a memorandum he wrote one month after his termination that summarizes the "talking points" from the July 22, 2020, meeting.[12] ECF 61, at 38 (citing ECF 61, at 19–21 ¶ 27–29); ECF 59-13 (Waan Memorandum). The talking points include the following concerns:[13]

- A complaint about the clothing reimbursement system in which Mr. Stephens questioned Mr. Waan about his clothing purchases followed by the program being cancelled, which Mr. Waan called "mass punishment," ECF 59-13, at 6;
- A complaint about the suspension of the R&R program in May 2020 as long as the 14-day quarantine requirement was in effect, *id.*;
- A complaint that all employees were asked to volunteer to work seven days a week for one month due to low manpower; *id.* at 6–7;
- A complaint about being "pressured" by Mr. Stephens to submit a statement without legal counsel in January 2020 after a female coworker filed a SHARP complaint against Mr. Waan, *id.* at 7;
- A complaint that Mr. Stephens rejected Mr. Waan's request to switch his day off, whereas another worker, McGirr (Caucasian), was able to switch days, *id.* at 7–8;
- A complaint about an unidentified employee that received a reprimand for oversleeping while another unidentified employee did not, *id.* at 8;
- A complaint that Mr. Waan was not allowed to drive to the dentist appointment "despite having given approval for other[] [unidentified employees] to drive," *id.*;
- A complaint about Mr. Waan accepting a junior-level pay grade while others with less experience had a mid-level pay grade, and Mr. Waan was denied the mid-level pay grade after six months for "being short" of twelve months FGS experience, while other unidentified employees were elevated to mid-level at the six-month mark, *id.*;
- A complaint that another employee, Wesley Terrill (Caucasian), was ordered by Mr. Stephens to use PTO for sick days as opposed to a floating holiday, and a complaint that Mr. Stephens did not know the FGS Employee Handbook, *id.* at 9;

---

[12] In Mr. Waan's statement of undisputed facts, he cites to Paragraphs 8–13 of his August 27, 2020, "Wrongful Termination" complaint statement, attached as "Exhibit M." *See* ECF 59-13, at 4–12 ¶¶ 8 –13; ECF 59-6, at 11, 21:6–13.

[13] Mr. Waan did not identify the races of the named employees in his statement. ECF 59-13. However, the races were provided in a memorandum, filed as part of a Department of Labor complaint and are included herein for clarity. *See* ECF 59-3, at 3.

- A complaint that during the May Covid-19 lockdown, on-base personnel were prohibited "from having off-base friends bring food from off-base establishments" while Mr. Stephens bought pizza off base and brought it to work, *id.*;
- A complaint that employees felt "hopelessness" and [w]e repeatedly felt unjustly rebuked, had opinions rejected, and had our feedback dismissed, *id.* at 9–10;
- A complaint that in May 2020, Mr. Waan asked HR if unused R&R could be cashed-in, and this question was routed to Dr. Haupt, and then to Mr. Stephens who answered the question in the negative, *id.* at 10;
- A complaint that another employee, Mitch Savini (Caucasian), filed an HR complaint against FGS leadership and was later demoted, *id.* at 10;
- A complaint that two employees that quit, Caleb Drehmer (Caucasian) and Levi Davidson (Caucasian), were unsatisfied that FGS planned to purchase them return tickets to their destination of choice three days later, as opposed to immediately, *id.* at 11;
- A complaint that terminated employees were not given enough time to manage their personal affairs before booking their flight off the base, *id.* at 11–12.

Of these complaints, only the pay grade denial, driving authorization denial, clothing reimbursement questioning, and denial of permission to switch his day off were specific to Mr. Waan. *See id.* at 6–12. The rest of the complaints involved general grievances about policies that impacted all FGS employees equally. *See id.* The only employees Mr. Waan mentioned that were also allegedly mistreated were all Caucasian employees. *See id.* at 6–12 (mentioning Wesley Terrill, Mitch Savini, Caleb Drehmer, and Levi Davidson); *see also* ECF 69-7, at 3 (indicating races of coworkers).

Furthermore, of the complaints that were made to Major Peate and were specific to Mr. Waan, Mr. Waan expressly disclaimed the belief that race had anything to do with those grievances at the time of his Department of Labor interview. *See* ECF 59-3, at 6 (indicating Mr. Waan did not believe his grievances about being denied the ability to switch his days off, his denied request to drive to his medical appointment, and his denied pay grade request had anything to do with

race).[14]  This raises the question of how precisely Major Peate "should have known" Mr. Waan was complaining of race-related discrimination when Mr. Waan himself did not believe race was a factor.  This is even more true when Mr. Waan concedes he did not use terms like "race," "national origin," "white," "Caucasian," or "discrimination" based on any protected category. ECF 52-4, at 58–59, 139:4–140:6; *id.* at 59, 140:15–21; *id.* at 60–61, 141:16–142:1.

Given the wide range of topics in the meeting, the fact that most of the complaints involved general allegations of policies that all employees suffered from, given that both Mr. Massey (Caucasian) and Mr. Waan (Asian/Cambodian) were complaining to Major Peate, ECF 52-4, at 9, 16:1–2, about universal grievances, and because the only specific reference to other mistreated individuals was to Caucasian employees, the Court cannot say that Major Peate "should have known" that Mr. Waan was complaining of an unlawful employment practice based on his race or national origin.  Viewing this evidence in total, Mr. Waan aired grievances about Mr. Stephens' management.  As previously stated, these general grievances do not constitute a protected activity. *Bowman*, 173 F. Supp. 3d at 248 ("General complaints of unfair treatment are not protected activity.")

This conclusion remains even if Mr. Waan used the word "disparate" as he testified at his deposition, ECF 52-4 at 59, 140:14, given the context of the statement "as a whole." *Bowman*, 173 F. Supp. 3d at 248 (citation omitted).  Given the context of Mr. Waan's generalized list of complaints to Major Peate about Mr. Stephens' alleged mismanagement, the word "disparate" in a vacuum would not alert a reasonable employer that an employee was complaining of an unlawful

---

[14] Mr. Waan argues that his perspective at the time of the interview, October 7, 2020, was that race was not involved, but sometime between the interview and his deposition on August 18, 2023, his perspective changed.  ECF 61, at 22 n.5; ECF 59-6, at 152:9–18 ("All I know is that I was not . . . approved for switching days off, but the people that got switched days off approved were white.").

employment practice in violation of Title VII. This conclusion is reinforced by Mr. Waan's description of the meeting in his Department of Labor complaint, *see generally* ECF 59-17, in which Mr. Waan stated Major Peate responded that he was "aware of [Mr.] Stephens's incompetency and planned to have [Mr. Stephens] removed from his position by the end of July 2020." *Id.* at 23; ¶ 40 (noting "the incidents Waan and Massey shared would 'give him more ammo'" as Major Peate sought removal of Mr. Stephens).[15]

Plaintiff has failed to point to caselaw that would show Plaintiff's mere mention of the word "disparate" amongst a litany of generalized grievances would alert Major Peate that Mr. Waan was complaining of race or national origin-based discrimination. *See* ECF 61, at 37–38 (citing *Okoli*, 648 F.3d at 232 n.8, which noted "[s]everal sister circuits have noted that sexual harassment complaints need not include 'magic words' such as 'sex' or 'sexual' to be effective."); *see also Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.").

In *Okoli*, the Fourth Circuit held that a plaintiff's complaints of "harassment" about "unethical and unprofessional business characteristics," should have alerted her employer that she was opposing an unlawful employment practice even if her complaint lacked the word "sexual." *Okoli*, 648 F.3d at 223–24. The Fourth Circuit held that the fact that the plaintiff's complaint alleged "harassment, degrading and dehumanizing yelling and demanding, disrespect, mocking

---

[15] Mr. Waan does not address why Major Peate would retaliate against him for complaining about Mr. Stephens when Major Peate apparently wanted to recommend termination for Mr. Stephens as well. *See* ECF 59-17, at 23 ¶ 40 (noting Major Peate responded to all of Mr. Waan's and Mr. Massey's concerns by saying that he was "aware of [Mr.] Stephens's incompetency and planned to have [Mr. Stephens] removed from his position by the end of July 2020" and that "the incidents Waan and Massey shared would 'give him more ammo.'").

and gossiping about other colleagues . . . and lack or disregard for integrity," should have put the defendant on notice that sexual harassment may be at issue, given that the words "degrading and dehumanizing" suggested the misconduct was "related to her identity—not a mere workplace squabble." *Id.* at 224. By contrast, the list of grievances Mr. Waan and Mr. Massey raised before Major Peate about Mr. Stephens, including issues about PTO, time-off, and pizza being brought to the work site are prototypical workplace grievances that Title VII is not designed to remedy. *See generally* ECF 59-13, at 6–12. As Plaintiff has failed to establish element one of his prima facie case of retaliation, Count II is dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendant FGS' motion for summary judgment is **GRANTED**. A separate implementing Order will issue.


Dated: <u>July 18, 2024</u>                                    <u>      /s/                    </u>
                                                       Brendan A. Hurson
                                                       United States District Judge